Charles SWAN and Josephine Swan,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 16128.

United States Court of Appeals
Sixth Circuit.

Feb. 7, 1966.

Charles F. Hartsock, Cincinnati, Ohio, for petitioners.

Solomon Warhaftig, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before EDWARDS and CELE-BREZZE, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This cause is before the Court on petition of Charles Swan and Josephine Swan, hereinafter called taxpayers, for review of a decision of the Tax Court of the United States. The Commissioner of Internal Revenue, respondent herein, determined a deficiency in the taxpayers' personal income tax for the taxable year ending December 31, 1955, in the amount of $24,437.40. The taxpayers brought their action in the Tax Court for a redetermination of the alleged deficiency. The Tax Court sustained the Commissioner.

The facts are fully stated in the Findings of Facts and Opinion of the Tax Court, reported at 42 T.C. 291. For the purpose of this opinion, we restate the essential facts, as follows: In 1955 and for a number of years prior thereto the taxpayers were the sole owners, except for two qualifying shares of the stock of Swan Construction, Inc., hereinafter referred to as Swan, Inc. Taxpayer Charles Swan was the president and a director of this corporation. On January 15, 1954, Charles Swan had uncashed salary checks of Swan, Inc. accumulated from May 31, 1952, in the amount of $39,-377.80. Income tax had been properly paid on this accumulated salary. By the early part of January, 1954, Charles Swan had become interested in a real estate development venture on property near Alexandria, Virginia.

Upon the advice of a Virginia lawyer, he organized a Virginia corporation named Charles Associates, Inc., hereinafter called Charles, Inc., through which to carry on the Virginia development project. Four hundred shares of Charles, Inc., at a stated price of $100 per share, were issued on March 29, 1954, as follows: 200 shares to taxpayer Josephine Swan, 198 shares to Charles Swan, 1 share to Ann Brooks, bookkeeper, and 1 share to Gilbert Frazee, treasurer of Swan, Inc. With the exception of the two qualifying shares, all of the stock of Charles, Inc., was owned or held continuously until August 17, 1955, by taxpayers.

On January 25, 1954, taxpayer Charles Swan secured from the First National Bank of Cincinnati a cashier's check in the amount of $40,000 in exchange for his uncashed salary checks and a small amount of additional cash. He subsequently deposited this check in a Washington bank in the name of Charles Associates, Inc. Charles Swan entered into a contract on January 26, 1954, for the purchase of land in Virginia, which was subsequently developed by Charles, Inc. Later this contract was assigned to Charles, Inc. for "One Dollar ($1.00) and other valuable consideration."

A document on a printed note form of the First National Bank of Cincinnati was executed at a time which the Tax Court finds is not clearly fixed in the record. This document reads, as follows:

"$40,000.00

Cincinnati, Ohio, February 3, 1954

Josephine On Demand or Chas Swan after date, I, WE, OR EITHER OF US, promise to pay to the order of X X X X X X the sum of ------ Forty Thousand and -------- 00/100 ---- Dollars, Payable at X X X X X X with interest at the rate of -------- per cent per annum from date                  ,
maturity.

The makers and endorsers hereof severally waive presentment, demand for payment, notice of dishonor, protest and notice of nonpayment and protest of this instrument, and agree and consent to all extensions and/or renewals which the holder hereof may grant.

VALUE RECEIVED.

(Signed) Chas Swan

Swan Construction Inc.

(Signed) G. J. Frazee, Treasurer."

The words "Josephine" and "or Chas Swan" appearing in the body of the document were in the handwriting of Charles Swan. The Xs deleted the words of the printed form, "The First National Bank of Cincinnati, Ohio." The account books of Swan, Inc., do not reflect any liability on a note relating to the foregoing document, nor is there any mention of such a loan in the corporate minutes of Swan, Inc. Under date of April, 1954, the cash receipts journal of Charles, Inc. indicated the receipt of cash from Swan, Inc., in the amount of $40,000. There was a corresponding credit to "Notes Pay." The words "Notes Pay" were subsequently crossed out and the words "Capital Stock" inserted in their place.

During the period from May 1, 1954, through March 10, 1955, Swan, Inc. loaned to Charles, Inc., for the development of the Virginia real estate venture, the sum of $365,645.62. Charles, Inc. issued interest-bearing notes to Swan, Inc. for these loans. On December 31, 1953, Swan, Inc. had on hand only $2980 in cash. At the same time it had notes and accounts receivable in the amount of $350,782.18. From January 1, 1954, to January 25, 1954, Swan, Inc. had cash receipts of $171,335.80. Its cash disbursements for the month of January were $34,100.08.

The minutes of a special meeting of the Board of Directors of Swan, Inc., held on August 16, 1955, contain the following statement:

"The President stated that in view of the fact that this corporation has advanced the sum of approximately $365,000 to Charles Associates, Incorporated, which sum is secured by notes and a mortgage of Charles Associates, Incorporated, it would seem

to be to the best interests of this corporation to purchase all of the outstanding stock of Charles Associates, Incorporated, in order to better secure the indebtedness.

"The President stated further that the stockholders of Charles Associates, Incorporated have offered to sell their stock in the corporation at their cost, to-wit: a total of $40,000.

"After a lengthy discussion, it was moved, seconded and unanimously carried that this corporation purchase all of the outstanding stock of Charles Associates, Incorporated from the shareholders of said corporation at a total purchase price of $40,000.00, and that the President be authorized to issue checks of this corporation to the respective shareholders of Charles Associates, Incorporated for such stock."

On the following day checks were issued to Josephine Swan for $20,000, to Charles Swan for $19,800, to Gilbert Frazee for $100, and to Ann Brooks for $100. On each of these checks there was a notation that the check was for the purchase of stock. The stock of Charles, Inc. was then transferred to Swan, Inc. As of December 31, 1954, Swan, Inc. had earned surplus and undivided profits of $145,245.04, and as of December 31, 1955, the earned surplus and undivided profits amounted to $197,452.99.

Two sections of the Revenue Code of 1954, Sections 304(a) (1) [1] and 302(a), (b) (1), (d) [2] of Title 26, U.S.C., primarily, are relevant to the facts of this case.

The Commissioner contends that since the taxpayers were in control of both Swan, Inc. and Charles, Inc., the payment to them of $39,800 by Swan, Inc. for the purchase of the stock of Charles, Inc. from the taxpayers, brought the transaction within Section 304(a) (1) and must be treated as if it were a redemption of Swan, Inc.'s stock. He further contends that under Section 302, a redemption of stock shall be treated as a dividend, if the redemption is essentially equivalent to a dividend.

The taxpayers concede that the transaction falls technically and literally within the provisions of Section 304. They claim, however, that the facts show, in substance, that the payment of $39,800 to them by Swan, Inc., on August 17, 1955, was not and could not have been essentially equivalent to a dividend. It is argued that the Court must disregard the form of the transaction and consider its substance. The principle that the incidence of taxation depends upon the substance and not the form of the transaction is not to be applied only when it

1. 304(a)—
   "(1) Acquisition by related corporation (other than subsidiary).
   "For purposes of sections 302 and 303, if—
   (A) one or more persons are in control of each of two corporations, and
   (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,
   then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation."

2. 302(a)—
   "If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock."
   302(b)—
   "(1) Redemptions not equivalent to dividends.
   Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend."
   302(d)—
   "Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317 (b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies."

benefits the government. Frelbro Corporation v. Commissioner of Internal Revenue, 315 F.2d 784, 786. This argument of taxpayers poses a question of fact.

■ The question presented is whether the payment to the taxpayers of $39,800 by Swan, Inc. was essentially a dividend. Under the authorities, this question must be determined upon the facts and circumstances of each case. Commissioner of Internal Revenue v. Champion, 78 F.2d 513, 514, C.A. 6; McGuire v. Commissioner, 84 F.2d 431, 433, C.A. 7, cert. den. 299 U.S. 591, 57 S.Ct. 118, 81 L.Ed. 435; Randolph v. Commissioner, 76 F.2d 472, 476, C.A. 8, cert. den. 296 U.S. 599, 56 S.Ct. 116, 80 L.Ed. 425; Earle v. Woodlaw, 245 F.2d 119, 122, C.A. 9, cert. den. 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1537; Hyman v. Helvering, 71 F.2d 342, 345, C.A.D.C., cert. den. 293 U.S. 570, 55 S.Ct. 100, 79 L.Ed. 669.

■ Briefly stated, the theory of the taxpayers is that Charles Swan advanced $40,000 to Charles, Inc., on behalf of Swan, Inc., and that this $40,000 was a loan from Charles Swan to Swan, Inc., for which Swan, Inc., issued its note payable to taxpayers. The stock of Charles, Inc. was taken in the name of the taxpayers merely as security for the loan. The financing of Charles, Inc. was at all times a project of Swan, Inc. The Tax Court held that the taxpayers had the burden to prove this theory and that they failed to sustain that burden. We agree.

A key fact in the chain of reasoning to support the taxpayers' theory concerns the initial $40,000 advanced to Charles, Inc. Virtually all of this $40,000 was derived from the uncashed salary checks which Charles Swan held against Swan, Inc. Charles Swan had paid the income tax on the salary which was represented by the checks and the money represented by those checks was his. The checks were issued unconditionally and Charles Swan was not required to do anything further to obtain possession of the money. He chose to utilize these checks on January 25, 1954. Whether he cashed the checks and bought a cashier's check or whether he transferred the checks to the bank in exchange for a cashier's check, as claimed by the taxpayers, is purely a matter of semantics and is of no importance. Charles Swan had his money and this closed the salary account.

Charles Swan first deposited this cashier's check in one Washington, D. C. bank and then subsequently transferred it to another Washington bank in the name of Charles, Inc. In March following, 398 of 400 shares of stock of Charles, Inc. were issued to taxpayers. This is the usual way that individuals would organize a corporation and would subscribe for its stock.

Charles Swan says that this was a loan by him to Swan, Inc. and an advance to Charles, Inc. by Swan, Inc., either as a loan to Charles, Inc., or for capital stock. In support of this claim, there is in the record an alleged note dated February 3, 1954, which the Tax Court found was issued "At sometime, not clearly fixed in the record, * * *." In this note made payable to no one, Charles and Josephine Swan appear to be the promisors and Charles Swan and Swan, Inc. appear to be the makers. The records of Swan, Inc. do not show any liability to Charles Swan on a note for $40,000, nor is there any record of an authorization for Swan, Inc. to borrow $40,000, or any other sum, from Charles Swan. Under date of April 1954, the records of Charles, Inc. show an advance of $40,000 from Swan, Inc. This was first marked "Notes Pay". These words were crossed out and the words "Capital Stock" inserted in their place.

The Tax Court found that Swan, Inc. had cash receipts in January of 1954, in the amount of $171,335.80 and cash expenditures of only $34,100.08. If this was true, there was no occasion for Swan, Inc. to borrow $40,000 to advance to Charles, Inc. Taxpayers say this was not true and that Swan, Inc. records for February 1, 1954, showed cash on hand of only $5919.96. The burden was on taxpayers to show the true status of the financial position of Swan, Inc. Even though this reasoning is not valid, a

question naturally arises in connection with Taxpayers' theory of a loan. Charles Swan had carried his uncashed salary checks for a year and a half. If Swan, Inc. were to finance Charles, Inc., why did not Charles Swan leave the salary checks uncashed and let Swan, Inc. issue a check to Charles, Inc.?

The facts of this transaction do not lend credence to the theory of a loan. Neither do the facts of the final transaction lend credence to the theory that the taxpayers merely held the stock of Charles, Inc. as security for a loan.

On August 16, 1955, the directors of Swan, Inc. held a special meeting, at which Charles Swan recommended that Swan, Inc. purchase the stock of Charles, Inc. (See page 4 of this opinion for minutes of this meeting.) He stated that the stockholders of Charles, Inc., of whom he was one, had offered to sell the stock to the corporation at their cost of $40,-000. After some discussion, the purchase was authorized. The following day two checks were issued to the taxpayers in the amount of $39,800. There was a notation on these two checks and on the two checks issued to the qualifying shareholders that the checks were issued for the purchase of stock. If the stock of Charles, Inc. were already owned by Swan, Inc. and had been held by the taxpayers merely as security, no action of the Board of Directors of Swan, Inc. would have been required. The note could have been paid and the stock endorsed to the corporation.

We conclude that the substance, as well as the form, of the transactions here involved bring this case within the provisions of Section 304. The taxpayers were in control of both Swan, Inc. and Charles, Inc. In return for the payment to them of $39,800, by Swan, Inc., they sold the stock of Charles, Inc. to Swan, Inc.

Alternatively, taxpayers argue that even if the transaction on August 16, 1955, constituted a redemption of stock of the taxpayers in Charles, Inc., it was at most only a final settlement of salary due to Charles Swan. We find no merit to this contention. Charles Swan's salary

claim was settled and terminated when he received the cashier's check on January 25, 1954. Estate of Henry A. Golwynne, Deceased v. Commissioner of Internal Revenue, 26 T.C. 1209, is not applicable to the facts of this case.

 We agree with the conclusion of the Tax Court "(T)hat the redemption distribution herein must be regarded as essentially equivalent to a taxable dividend." This conclusion is supported by the evidence and is not clearly erroneous. The clearly erroneous rule (Rule 52(a) Federal Rules of Civil Procedure) applies to inferences drawn from undisputed facts, as well as to a finding of facts on disputed evidence. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

The decision of the Tax Court is affirmed.